☑ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Residences and automobiles belonging to<br>and/or occupied by Devante Adams, as listed<br>in the Attachments | )<br>)<br>)<br>)<br>)<br>) | Case No.23-1813M(NJ)<br>**Matter No.: 2023R00139** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

  See Attachment A; over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

  See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 10/25/2023 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 10/11/2023 @ 11:11 a.m. _____

City and state:      Milwaukee, WI _____

*Judge's signature*

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>**ATTACHMENT A**</u>

<u>**Premises to be Searched**</u>

1.      **3351 N. 91st St. Milwaukee, WI, and Detached Garage (Premises 1):** The residence is described as a two-story residence with beige siding, white trim, and has a shingled roof, with a detached garage. The front of the residence faces east and has two concrete steps leading to the front door which is secured by a white in color security door. The numbers "3351" are affixed along the right/north-side of the front entry. The property also has a cement walkway which leads to the front of the residence as well as wraps around to the south perimeter, leading to the side entry and rear of the residence. Located to the rear of the residence is a detached garage facing west with white siding and a shingled roof, which is attached to the alley and neighbored by a parking slab to the south. Below is a photograph of the front of the residence. This Search Warrant is to include areas within the Premises where firearms and other contraband can be secreted, including but not limited to storage lockers, detached closets, silos, outbuildings, detached garages, containers, vehicles and curtilage and yard areas connected to the Premises.



Case 2:23-mj-01813-NJ    Filed 10/11/23    Page 3 of 52    Document 1

## Vehicles to be Searched

2.    **TARGET VEHICLE 1:** A silver in color Ford Focus bearing Wisconsin registration plate ASW-2707. Below is a photograph(s) of Target Vehicle 1, if located in the Eastern District of Wisconsin.



3.    **TARGET VEHICLE 2:** A white in color Chevy Malibu bearing WI registration ARL-8640. Below is a photograph of Target Vehicle 2, if located in the Eastern District of Wisconsin.



37

# ATTACHMENT B

## Particular Things to be Seized

All physical items, records, and information on the Premises and within the Target Vehicles described in Attachment A, or on any cellphones, computers, electronic devices, and media storage devices containing evidence of or used as a means to commit violations of Title 18, United States Code, Section 922(g)(1); Engaging in the Business Without a Federal Firearms License, in violation of Title 18, United States Code, Section 922(a)(1)(A); and False Statement During the Purchase of a Firearm, in violation of Title 18, United States Code, Section 922(a)(6) & 924(a)(1)(A), including but not limited to the following, occurring after September 30, 2018:

  a. ATF Form 4473s, firearms, firearm boxes, bipods, tripods, upper receivers, receipts and any records related to firearms, firearms accessories, and ammunition.

  b. Any and all financial records, including bank records, checks, credit card bills, account information, connected to the purchase, sale, or distribution of firearms, and any correspondence between suspects, conspirators, and other firearms sellers and/or purchasers;

  c. Lists of contacts and any identifying information;

  d. Lists of customers and related identifying information;

  e. Photographs, videos, or other media storage connected to firearms;

  f. Types, amounts, and prices of firearms purchased/sold;

  g. Any information related to sources or purchasers of firearms (including names, addresses, phone numbers, or any other identifying information);

  h. Any information recording a suspect or conspirator's schedule or travel from September 30, 2018 to the present;

38

i.  All bank records, checks, credit card bills, account information, and other financial records related to firearms commerce;

j.  Any and all financial records connected to the purchase/sale of firearms;

k.  Proceeds of firearms trafficking activities, including United States currency;

l.  Personal address books, telephone bills, photographs, letters, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in firearms trafficking activities;

m.  Documents and deeds reflecting the purchase or lease of items obtained with the proceeds from firearm trafficking activities;

n.  Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

o.  Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data;

p.  Indicia of occupancy, residency or ownership of the premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys;

q.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

39

r.   Records and information relating to a conspiracy traffic firearms;

s.   Records and information relating to the e-mail and Facebook accounts names in the affidavit;

t.   Records and information relating to the identity or location of the suspects;

u.   Records and information relating to the crimes referenced in paragraph 1 above.

2.   Evidence obtained from the forensic examination of all cellphones, computers, electronic devices, and media storage devices containing evidence of or used as a means to commit the violations described above.

3.   For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"[1]):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

---

[1] The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, cellphones, mobile phones, tablets, server computers, and network hardware.

40

c. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. records of or information about Internet Protocol addresses used by the COMPUTER;

j. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

41

videotapes, motion pictures, or photocopies).

The term "storage medium" includes any physical object upon which computer or cellphone data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of ADAMS; (2) hold a device found to belong to ADAMS in front of ADAMS's face, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Residences and automobiles belonging to and/or<br>occupied by Devantte Adams, as listed in the<br>Attachments | )<br>)<br>)<br>)<br>)<br>) |

Case No.23-1813M(NJ)

## Matter No.: 2023R00139

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A; over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 371; 922(a)(6); and<br>924(a)(1)(A) | Possession or sale of firearms; Evidence of straw purchasing firearms and illegal<br>firearms trafficking; |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*SA Brendan Mulvey*
*Applicant's signature*

SA Brendan Mulvey, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 10/11/2023

*Judge's signature*

City and state: Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
## Matter No.: 2023R00139

I, Brendan Mulvey, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3351 N. 91st St. Milwaukee, WI, 53222, including a detached garage ("Premises 1"); a silver in color Ford Focus bearing Wisconsin registration plate ASW-2707 ("Target Vehicle 1"); and a white in color Chevy Malibu bearing WI registration ARL-8640 ("Target Vehicle 2"), further described in Attachment A, for the things described in Attachment B.

2.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3.      I am a Special Agent in the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so employed since June 2018. I am presently assigned to the ATF Milwaukee IV Field Office in Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

4.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving controlled substances, and firearms, I know that individuals involved with and/or associated to drug and firearms trafficking commonly use the social media platform Facebook to facilitate their drug and firearm trafficking activities. Like

most everyone else today, drug and firearm traffickers typically have a Facebook profile and are able to access it via their computer or cellular telephone. Drug and firearm traffickers commonly maintain a Facebook profile, and sometimes allow other drug and firearm trafficking associates to use their profile, to conduct criminal gang activity and/or drug and firearm trafficking business.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Possession of a Firearm by a Convicted Felon, in violation of Title 18, United States Code, Section 922(g)(1); Engaging in the Business Without a Federal Firearms License, in violation of Title 18, United States Code, Section 922(a)(1)(A); and False Statement During the Purchase of a Firearm, in violation of Title 18, United States Code, Section 922(a)(6) & 924(a)(1)(A), have been committed by Devantte ADAMS ("ADAMS" herein), Canisha DONELSON ("DONELSON" herein), and Quentin TUCKER ("TUCKER" herein), and others, known and unknown, as explained below.

7.      There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## **PROBABLE CAUSE**

8.      Your affiant knows, from his training and experience, that individuals who are deemed "prohibited" cannot legally purchase firearms from a Federal Firearms Licensee (FFL) because of previous felony convictions, because of a previous conviction of misdemeanor crime

2

of domestic violence, because they are underage, or for other reasons which make them prohibited from purchasing a firearm from an FFL. Prohibited individuals who want to obtain a firearm will often recruit "straw purchasers" to illegally obtain firearms on their behalf. These "straw purchasers" are often completed with the intent to conceal the identity of the intended recipient of the firearm. These types of transactions are commonly conducted for financial gain of the "straw purchaser" or as the result of a relationship between the previously convicted felon and the original purchaser. When a firearm is recovered by law enforcement, the firearm information is generally submitted for tracing information. This tracing information can help to identify the origin of the firearm. A common indicator of a firearm straw purchase can be the existence of a relatively short time span between the purchase of a firearm and its ultimate recovery by law enforcement during a crime or as part of a criminal investigation. Under these circumstances, the short "time to crime" (TTC) serves as an investigative lead.

9.     On or about April 3, 2023, your affiant was contacted by an employee from Federal Firearms Licensee (FFL) Select Fire Weaponry, located at 2325 Park Lawn Dr., Unit B, Waukesha, WI 53186, regarding suspicious purchase activity being made by DEVANTTE ADAMS. The employee stated ADAMS attempted to purchase a Glock, model 43, 9mm caliber pistol, but the transaction was denied due to the FFL's suspicion that ADAMS was engaged in illegal activity. The employee stated that they had previously received multiple trace requests from ATF in which ADAMS was found to be the original purchaser of a recovered firearm. This ultimately fueled their decision to no longer sell firearms to ADAMS. The employee also informed your affiant that two [2] vehicles were with ADAMS when he arrived at the store and ADAMS entered the business with an unknown female. The employee stated that another unidentified individual waited outside while ADAMS was inside the store. Your affiant observed this activity to be consistent with an

3

attempted straw-purchase of a firearm. Once the sale was denied, ADAMS and the two [2] unknown vehicles departed the area without further incident.

10.     Your affiant conducted a query of ATF's eTrace system for firearm trace reports and multiple sale reports that were associated to ADAMS. The query revealed that ADAMS was connected to twelve firearm trace reports and two multiple sale reports. The following is a synopsis of the trace and multiple sale reports associated to ADAMS:

- On April 14, 2023, the Milwaukee Police Department (MPD) recovered a Glock, model 26, 9mm caliber pistol bearing serial number BSRM728 at 1607 W. Meinecke Ave, Milwaukee, WI 53206, while investigating a theft complaint. ADAMS purchased the firearm on August 19, 2021, from Select Fire Weaponry, located at 2325 Parklawn Dr., Unit B, Waukesha, WI 53186. The Time to Crime (TTC) on the firearm was 603-days.

- On March 10, 2023, the Brookfield Police Department (BPD) recovered a Ruger, Model Security-9, 9mm caliber pistol bearing serial number 381-25389 from a convicted felon during a narcotics-related incident at 375 S. Moorland Road, Brookfield, WI 53005. ADAMS purchased the firearm on October 24, 2018, from Dunham's Sports #9011, located in Brookfield, WI. The Time to Crime (TTC) on the firearm was 1,598 days.

- On November 23, 2022, the Milwaukee Police Department (MPD) recovered a Walther, model PDP, 9mm caliber pistol, bearing serial number FDE8209, following the commission of a crime. ADAMS purchased the firearm on March 7, 2022, from Select Fire Weaponry, located in Waukesha, WI. The TTC on the firearm was 261-days.

4

- On October 9, 2022, the MPD recovered a Beretta, Pietro S.P.A., model APX Centurion, 9mm caliber pistol, bearing serial number A062392X, during a during a narcotics related incident. ADAMS purchased the firearm on May 12, 2020, from Shorty's Shooting Sports, Located in West Allis, WI. The time-to-recovery (TTR) was 880-days. The firearm was also test-fired, and the casings analyzed through the National Integrated Ballistics Information Network (NIBIN) to determine if the firearm/casings correlate to any previous shooting incidents. Upon doing so, ATF determined the firearm to be connected to three [3] shooting incidents with the first occurring on May 12, 2021. The adjusted TTC on the firearm was 365-days. The firearm was also determined to have been utilized during a Homicide that occurred in Milwaukee on June 7, 2023.

- On March 1, 2022, the MPD recovered a Canik55, model TP-9SF Elite, 9mm caliber pistol, bearing serial number 21BH05425 at 1932 N. 26th St, Milwaukee, WI 53208. ADAMS purchased the firearm on June 16, 2021, from Select Fire Weaponry, located in Waukesha, WI. The TTC on the firearm was 258 days.

- On October 7, 2021, the MPD recovered a FNH USA, LLC, model 509, 9mm caliber pistol, bearing serial number GKS0134669 from a convicted felon during a homicide investigation at 1837 Becher St., Milwaukee, WI 53215. ADAMS purchased the firearm on March 13, 2021, from FFL Fleet Farm, located in Germantown, WI. The TTC on the firearm was 208-days.

- On September 12, 2021, the MPD recovered a Glock, model 19, 9mm caliber pistol, bearing serial number BTPT098, following a fleeing and

5

eluding incident at 7240 W. Grantosa Dr., Milwaukee, WI 53218. ADAMS purchased the firearm on August 28, 2021, from Select Fire Weaponry, located in Waukesha, WI. The TTC on the firearm was 15-days.

- On August 19, 2021, ADAMS purchased a Glock, model 23, .40 caliber pistol, bearing serial number BTSH142, and a Glock model 26, 9mm caliber pistol, bearing serial number BSRM728 from Select Fire Weaponry, located in Waukesha, WI.

- On April 5, 2020, the MPD recovered a Taurus, model PT111 Millennium G2, 9mm caliber pistol, bearing serial number TKS34439 following a narcotics-related crime that occurred at 128 W. Concordia St., Milwaukee, WI 53212. ADAMS purchased the firearm on August 17, 2017, from Fleet Farm, located in Germantown, WI. The TTC on the firearm was 962-days.

- On August 15, 2019, the MPD recovered a Taurus, model PT845, .45 caliber pistol, bearing serial number NHS72260 from a convicted felon at 2412 W. Cypress St, Milwaukee, WI 53206. ADAMS Purchased the firearm on July 24, 2015, from FFL Shorty's Shooting Sports, located in West Allis, WI. The TTR on the firearm was 1,483-days. The firearm was also test-fired and the casings analyzed through the NIBIN system to determine if the firearm/casings correlate to any previous shooting incidents. Upon doing so, ATF determined the firearm to be correlated to three [3] separate shooting incidents, with the first occurring on November 21, 2015. The adjusted TTC was 120-days.

- On January 28, 2019, the Chicago Police Department (CPD) recovered a Smith & Wesson, model SD9VE, 9mm caliber pistol, bearing serial

6

number FXU2118, from a suspect at 4308 Augusta, Chicago, IL 60601. ADAMS purchased the firearm on May 27, 2016, from Fleet Farm, located in Germantown, WI, thus having a TTR on the firearm was 976 days. The firearm was also used during two [2] previous shooting incidents in the Chicago, IL area, with the first incident occurring on December 21, 2017. The adjusted TTC was 573-days. The second shooting was observed to have occurred 286-days later on October 4, 2018.

- On April 25, 2018, the MPD recovered a Sarsilmaz, model SARK2P, 9mm caliber pistol, bearing serial number T1102-16C04335 during an incident that occurred at 2910 W. Capitol Dr, Milwaukee, WI 53210. ADAMS purchased the firearm on February 15, 2017, from FFL Shorty's Shooting Sports, located in West Allis, WI. The TTC on the firearm was 434-days.

- On June 4, 2017, MPD recovered a CBC, model 715B, .22 caliber pistol, bearing serial number EMJ3947672 during a narcotics-related offense that occurred at 2931 N 19th St, Milwaukee, WI 53206. ADAMS purchased the firearm on March 16, 2017, from FFL Gander Mountain #12, located in the Eastern District of Wisconsin, thus having a TTC of 82-days.

- On May 27, 2016, ADAMS purchased a Smith & Wesson, model SD40VE, .40 caliber pistol, bearing serial number FXR7688, and a Smith & Wesson, model SD9VE, 9mm caliber pistol, bearing serial number FXU2118, form Fleet Farm, located in Germantown, WI.

11. ATF identified five [5] additional firearms purchased by ADAMS which have not yet been recovered. The purchases and the dates that they occurred are detailed as follows:

7

- November 9, 2018: Carl Walther, model PK380, .380 caliber pistol, bearing serial number WB145269 (Mill's Fleet Farm)

- August 15, 2020: Canik, model TP9SF, 9mm caliber pistol, bearing serial number 20AT18484 (Select Fire Weaponry)

- August 18, 2021: Glock, model 23, .40 caliber pistol, bearing serial number BTSH142 (Select Fire Weaponry)

- December 17, 2021: Glock, model 43X, 9mm caliber pistol, bearing serial number BVMN320 (Select Fire Weaponry)

- June 23, 2022: FN, model 509M, 9mm caliber pistol, bearing serial number GKS0202115 (Select Fire Weaponry)

12.     Your affiant obtained and reviewed law enforcement incident reports pertaining to firearm recoveries associated to ADAMS. Your affiant has utilized reports such as these in the past during the regular course of his duties and has found them to be truthful and reliable. While doing so, your affiant identified Milwaukee Police Incident Report 212550224, pertaining to the recovery of the Glock, model 19, 9mm caliber pistol, bearing serial number BTPT098 on September 12, 2021 (See above). This firearm was recovered during a fleeing and eluding/narcotics-related incident just fifteen [15] days after having been purchased by ADAMS from Select Fire Weaponry on August 28, 2021.

13.     According to the report, while in the area of W. Glendale Ave and N. 31st St., MPD Officers observed several subjects standing in the roadway and conversing with the driver of a black 2010 Acura TL bearing WI plates AMA-7935 near/around the driver-side door. After a brief exchange, the subjects then turned and walked away from the Acura and entered a separate vehicle

8

parked nearby. Officers recognized the interaction to be consistent with a hand-to-hand narcotics transaction and approached the Acura.

14.      Officers observed the vehicle to be occupied by a single occupant driver, identified as Cornelius MILLER. Upon approaching the vehicle, Officers immediately observed two [2] large clear plastic sandwich bags containing a large amount of a green leafy plant-like substance suspected to be marijuana in the vehicles cup holder area, along with two [2] large plastic vacuumed sealed style bags in the rear driver floorboard area containing a large amount of a green leafy plant like substance suspected to be marijuana. Officers also observed a clear plastic corner-cut baggie containing a green leafy plant like substance suspected to be marijuana in plain view in the driver door handle.

15.      MILLER subsequently accelerated away from MPD officers, and a vehicle pursuit ensued. MILLER ultimately crashed his vehicle and was taken into custody. During a search of the vehicle, Officers located the aforementioned Glock pistol seated on the drivers-side floorboard, along with additional contraband in various locations.

16.      During a subsequent Mirandized interview, MILLER related that he was recently given the Glock by his cousins or brothers, and that they provided it to him for protection since he is selling marijuana.

17.      Your affiant then began to review recorded jail phone calls made by MILLER during his incarceration following the incident. On September 14, 2021, at approximately 1253 hours, MILLER made an outgoing telephone call to a female subject, in which he identifies ADAMS as the source of the recovered firearm. In summation MILLER stated the following: "That gun was cuz gun… the fat cuz. 'Devantte Adams' on Facebook."

9

18.     Your affiant received information from an offline National Crime Information Center (NCIC) query indicating that ADAMS had a firearms background check run on him subsequent to his attempted purchase at Select Fire Weaponry. Your affiant also identified ADAMS to have approximately twenty-seven [27] presumed background checks during firearms purchases run on him through the Wisconsin Department of Justice (DOJ) Firearms Terminal between July 24, 2015, to April 3, 2023. Your affiant then contacted an employee of FFL Dunham's Sports to inquire of any firearms purchased by ADAMS from any of their store locations. Upon doing so, your affiant identified ADAMS to have purchased a Glock, model 43X, 9mm caliber pistol, bearing serial number BZRM347, from Dunham's Sports, located at 18200 W. Bluemound Rd, Brookfield WI 53045, on April 3, 2023.

19.     Upon receiving this information, your affiant was made aware of an additional purchase made by ADAMS from Dunham's Sports located in Brookfield, WI, of a Ruger, model Security-9, 9mm caliber pistol, bearing serial number 381-25389. This firearm was previously identified by ATF as having been recovered by law enforcement in the possession of a convicted felon on March 10, 2023.

20.     As part of this investigation, your affiant obtained and reviewed security footage that recorded ADAMS visit to Select Fire Weaponry and Dunham's Sports on April 3, 2023. Upon reviewing the footage from Select Fire Weaponry, your affiant observed ADAMS arrive at the store at approximately 1653 hours, as the passenger of a silver in color Ford Focus with a black decal along the sides ("SV-1" herein). Your affiant also observed a silver in color unknown model, Chevrolet sedan, with a hubcap missing from the front passenger-side wheel ("SV-2" herein) to have also arrived with and park directly behind SV-1 in the Select Fire Weaponry lot.

10

21.     Upon parking, a heavy-set black male wearing multi-colored hooded sweatshirt and gray sweatpants, identified as ADAMS, is observed exiting the front passenger seat of SV-1 and walking towards SV-2 and entering the rear passenger seat along the vehicle's drivers-side. Moments later, ADAMS is observed exiting the rear passenger seat of SV-2 and begins walking towards the stores front entrance. An unknown heavy-set black female with long hair, wearing a multi-colored jacket/hooded sweatshirt, gray sweatpants, and carrying a beige purse ("Unknown Female-1" herein) is then observed exiting the driver's seat of SV-2 and walking behind ADAMS towards the stores front entrance. At approximately 1656 hours an additional unknown female with her hair tied up, wearing a gray hooded sweatshirt and black pants ("Unknown Female-2" herein) is observed exiting SV-2 and walking towards the stores front entrance.

22.     Adams and "Unknown Female-1" and "Unknown Female-2" appeared to have traveled together to the FFL and appeared to confer on what types of firearms to purchase.

23.     Your affiant then reviewed footage obtained from Dunham's Sports that captured ADAMS purchase. The recording beings at approximately 1757 hours showing ADAMS standing at the gun counter with the aforementioned unknown females. All three [3] subjects appear to be peering through the display case/gun counter at various handguns on display.

24.     ADAMS was observed completing firearm purchase paperwork. At approximately 1831 hours, ADAMS is observed at the cash register area meeting with the store associate who is carrying what appears to be a black/dark in color gun box housing the aforementioned Glock, model 43X, 9mm caliber pistol, bearing serial number BZRM347. The associate is observed scanning what appears to be a box of Blazer brand 9mm caliber ammunition. ADAMS is then observed removing what appears to be US currency from his pocket. Moments later, ADAMS and Unknown Female-1 are observed exiting the store while Unknown Female-2 waits near the

11

register. ADAMS and Unknown Female-1 are observed returning inside the store and approaching the register. ADAMS then begins counting a sum of currency in front of the store associate. The associate then collects and counts the currency and places it inside the register. As this is happening, Unknown Female-1 can be seen looking at/scrolling on her cell phone.

25.     ADAMS and the unknown females are then observed exiting the store. Your affiant recognized the incident at Select Fire Weaponry and Dunham's Sports to be consistent with a straw purchase of a firearm.

26.     As part of this investigation, your affiant submitted photographs of the unknown females who accompanied ADAMS during the purchase of the Glock. Upon doing so, your affiant received a correlation between Unknown Female-1 and Canisha DONELSON. A check of DONELSON's criminal history revealed her to have been previously convicted of a felony in the state of Wisconsin for Possession with Intent to Distribute Heroin (Party to a Crime), related to Milwaukee County Case Number 2017CF000284, and Forgery-Alter Value of Object/Theft, related to Milwaukee Count Case Number 2006CF001469.

27.     While reviewing transaction paperwork completed by ADAMS during the above detailed purchase, your affiant observed him to have provided a telephone number of (414) 737-6433 as his point of contact alongside his signature at the bottom of Section 1 of the Wisconsin (WI) Department of Justice (DOJ) Firearms Dealer Notification (Handgun Transfers) form. Your affiant identified the service provider for the listed number to be AT&T Mobility. Your affiant then obtained a United States Grand Jury Subpoena for subscriber information and toll records associated to the number provided by ADAMS. These records were then received by your affiant on June 6, 2023. Upon reviewing the Subscriber Information section of the return, your affiant observed the telephone number to be active with an activation date of February 18, 2023. While

12

reviewing call detail records associated with the telephone number, your affiant observed ADAMS to have been in communication with telephone number (414) 295-3052 numerous times leading up to his attempted firearm purchase from Select Fire Weaponry on April 3, 2023. Your affiant conducted a check of the telephone number for unofficial subscriber information using law enforcement databases and observed DONELSON to list as the likely user. Your affiant observed the last contact between ADAMS and DONELSON prior to their arrival at Select Fire Weaponry to have occurred at approximately 1528 hours. As previously stated, ADAMS and DONELSON arrived at Select Fire Weaponry at approximately 1653 hours and departed at approximately 1715 hours. Your affiant observed ADAMS telephone to have engaged in numerous cellular data sessions while at Select Fire Weaponry. Your affiant believes the data sessions to be indicative of usage of an internet-based application system such as Facebook, Instagram, etc. Your affiant is aware that cellular data enables mobile devices to access the internet when they are not connected to a Wi-Fi network. Your affiant is also aware that internet-based applications such as Facebook and Instagram have messaging features such as "Messenger", which is an application that allows users to communicate and send messages between one another.

28.     On April 3, 2023, at approximately 1738 hours, ADAMS then made an outgoing telephone call to telephone number (414) 250-2172. A query of the telephone number through law enforcement databases revealed the unofficial subscriber to be Quentin TUCKER. Approximately one minute later, ADAMS then received an incoming call from TUCKER, which then concluded at approximately 1744 hours. Your affiant observed the call to last a duration of approximately four minutes and forty-five seconds. It is important to note that these calls made/received by ADAMS from DONELSON and TUCKER occurred following ADAMS and DONELSON's departure from Select Fire Weaponry and before their arrival at Dunham's Sports.

13

29.     As part of this investigation, your affiant then conducted a routine background check of TUCKER and observed him to have been previously convicted of a felony offense in the state of Wisconsin for Possession with Intent to Distribute Cocaine, related to Milwaukee County Case Number 2001CF005651. Your affiant also observed TUCKER to have been convicted in 2009 of Federal cocaine possession and distribution charges in the Eastern District of Wisconsin. TUCKER also currently has an open felony case in Milwaukee County for numerous narcotics-related charges to include Possession with Intent to Distribute Heroin (Party to a Crime (PTAC)), Possession with Intent to Distribute Cocaine (PTAC) (x2) and Maintain a Drug Trafficking Place (PTAC) (x2), related to Milwaukee County Case Number 2020CF002778.

30.     While reviewing TUCKER's residential history, your affiant observed he and DONELSON to have two common addresses, with a previous address of 5749 N 62nd St, Apt 2, Milwaukee, WI 53218, and a possible current address of 4438 N 44th St, Milwaukee, WI 53218. Your affiant subsequently conducted utilities check of 4438 N 44th St. and observed DONELSON to list as the current resident.

31.     Also, while reviewing recorded jail telephone calls made by TUCKER during periods of incarceration in Milwaukee County between 2019 and 2021, your affiant observed numerous telephone calls made by TUCKER to DONELSON. Based on a review of the telephone calls, your affiant believes the context of the conversations to be indicative of a relationship between TUCKER and DONELSON.

32.     Continuing in June 2023, your affiant conducted surveillance operations of 4438 N. 44th St., Milwaukee, WI 53218. On June 13, 2023, at approximately 2150 hours, your affiant observed a silver in color Chevrolet Malibu with WI registration plate AMB-4584 set against the vehicles rear windshield, parked directly across the street from the residence on the west side of

14

N. 44th St. facing Southbound. Your affiant conducted a check of the registration via the WI DOT and observed the registered owner of the vehicle to be DONELSON, with an address of 4438 N. 44th St., Milwaukee, WI 53218. Your affiant observed this vehicle to be the same as the one utilized by DONELSON on the date of ADAMS purchase of the Glock, model 43X pistol, on April 3, 2023.

33.     Your affiant then reviewed previously obtained historical telephone records for ADAMS cellular device, (414) 737-6433, for any communication between him and DONELSON/TUCKER around the times of the aforementioned transactions on March 31, 2023. Upon doing so, your affiant observed ADAMS to have engaged in seven [7] successful telephone calls with TUCKER's cellphone, (414) 250-2172, on March 31, 2023, with many of the calls occurring around the time of the Cash App transfers between TUCKER and DONELSON's cellphone, (414) 295-3052. Additionally, TUCKER was observed to be the second most contacted telephone number by ADAMS on this date. Additionally, ADAMS engaged in five [5] successful voice calls with DONELSON on this date. Your affiant observed the amount transferred by TUCKER to DONELSON to be consistent with the purchase price of the Glock pistol bought by ADAMS on April 3, 2023. Your affiant also believes the communications observed on this date to be indicative of the three [3] subjects orchestrating a firearm straw purchase.

34.     ATF also investigated financial applications utilized by ADAMS, DONELSON, and TUCKER. Upon doing so, your affiant identified a Cash App account belonging to DONELSON bearing "$Cashtag" $montaemom, with associated telephone number (414) 295-3052. Your affiant also identified an additional Cash App account belonging to TUCKER bearing "$Cashtag" $playafly26, with associated telephone number (414) 250-2172. Cash App explains a $Cashtag is a unique identifier for individuals and businesses using Cash App which automatically

15

creates a shareable URL allowing other Cash App users to privately send and receive payments to and from a specific account. ATF then obtained a United States Grand Jury subpoena for subscriber/transaction records associated with the aforementioned accounts. Upon reviewing the data, your affiant observed TUCKER and DONELSON to have engaged in multiple Cash App transactions between one another on March 31, 2023, in which TUCKER transferred a total of $630.00 USC to DONELSON. It is important to note that these transactions occurred just four [4] days prior to ADAMS April 3, 2023, purchase of the Glock pistol from Dunham's Sports in the presence of DONELSON. Furthermore, ADAMS purchased the firearm for $575.38 USC utilizing cash.

### FACEBOOK USAGE

35.     Through the course of this investigation, your affiant began investigating social media accounts utilized by the aforementioned suspects. Upon doing so, your affiant identified a Facebook account user by username "Devantte ADAMS" bearing Facebook ID: 100023135621876, with a display picture of a heavy-set black male adult whom your affiant recognized to be ADAMS. Your affiant then began to review publicly viewable information on ADAMS Facebook page.

36.     Your affiant then began reviewing individuals who reacted to a post made by ADAMS to his account and identified a Facebook account with user/display name "Monique Montae", bearing Facebook ID: ": 100065705853482, with a display picture of a heavy-set black female adult whom your affiant believed to be DONELSON. Your affiant then conducted a query of Facebook for users named "Canisha Donelson" and identified an additional account bearing Facebook ID: 100068896616603. Your affiant observed the individual pictured in the profile's display picture to be a heavy-set black female adult, whom your affiant also believed to be

16

DONELSON. Your affiant observed the picture to depict a black female wearing a white shirt with red/white lettering that appears to read "Make Money Not Friends" and was posted to the account on June 9, 2021. Your affiant also observed the picture to contain an over-head caption that reads "MONTAE MOM". Your affiant then cross-referenced the picture to a photograph posted to "Monique Montae's" account on June 6, 2021, which shows the same black female wearing the same shirt that appears to read "Make Money Not Friends". Your affiant observed these individuals to be one and the same. Your affiant therefore concluded both accounts to be utilized by DONELSON.

37.     While reviewing publicly viewable information on DONELSON's Facebook account under username "Monique Montae", your affiant identified numerous photographs depicting DONELSON and ADAMS together. Your affiant also identified a photograph posted to the account on June 19, 2022, depicting DONELSON with an adolescent black male as well as and a black male adult wearing a black doo-rag, black shirt, and red shorts. Your affiant also observed a caption posted alongside the photograph that reads: "HAPPY FATHERS DAY TO MY ONE AND ONLY BD [Heart emoji] I DON'T CARE WHAT YOU THINK OF HIM HE A FATHER TO THIS ONE [Flexing emoji] Ball Onem MONTAE DAD ONE SON ONE BD [Check mark emoji]" (See Figure 2). Your affiant is aware that "BD" is an acronym used to indicate "Baby Daddy". Your affiant is also aware that "Baby Daddy" is common vernacular used to reference the father of one's child. Your affiant also observed an additional Facebook account to be "tagged" in the caption bearing the username "Ball Onem" with associated Facebook ID: 100077749593823. Your affiant is aware that "tagging" is a Facebook feature that enables users to mention/label other users when they are referenced in a post/pictured in a photograph. This also notifies the "tagged" user that they were pictured/their account was mentioned by another

17

Facebook users account. Your affiant then compared the black male adult pictured in DONELSON's photograph with TUCKER's WI state-issued driver's license image and surmised that the two individuals were the same. Your affiant therefore concluded TUCKER to be the user of the tagged Facebook account "Ball Onem". Your affiant then began to review publicly viewable information on TUCKER's account. Your affiant subsequently observed ADAMS account listed in the "Friends" section of TUCKER's account, further establishing the two [2] to be associated.

38.     In July 2023, your affiant obtained and served a Federal Search Warrant on Meta Platforms, Inc. ("Meta") for account data associated to accounts belonging to ADAMS, DONELSON, and TUCKER. While reviewing messages associated to ADAMS account, your affiant identified numerous conversations involving ADAMS and various individuals regarding the sale and purchase of marijuana/narcotics.

39.     During a conversation on May 25, 2023, between ADAMS and account user "DreDay Haney" with Facebook account ID: 100000243690650, "DreDay Haney" inquires whether ADAMS has "OG" for sale. Your affiant is aware that "OG" is used to refer to a certain strain of marijuana. ADAMS then directs "DreDay Haney" to contact "Ball" who has "OG" and provides him telephone number (414) 250-2172. Your affiant previously served a Grand Jury subpoena to T-Mobile for records associated to telephone number (414) 250-2172 and identified TUCKER to be the official subscriber. Furthermore, your affiant is also aware that TUCKER identifies by the moniker "Ball" or "Ball Onem".

40.     Your affiant also identified numerous additional conversations between ADAMS and "DreDay Haney" in which "DreDay Haney" solicits ADAMS regarding the purchase of "rollers". Your affiant is aware that "rollers" is street vernacular used to refer to ecstasy pills. During one such conversation on June 23, 2023, ADAMS indicates that TUCKER has ecstasy

18

after being asked by "DreDay Haney" whether he had any for sale. ADAMS then asks "DreDay Haney" how many pills of ecstasy he is looking to purchase. "DreDay Haney" then states, "Ball do 6 for 20". ADAMS then responded, "Ok here I come". Your affiant recognized this conversation to be consistent with the arrangement of the sale of narcotics.

41.     Your affiant also identified numerous conversations in which ADAMS appears to advertise the sale of firearms. For instance, your affiant identified a conversation between ADAMS and Facebook user "Mastah P Trilla" with Facebook account ID: 100052803465687, in which ADAMS advertises and negotiates the sale of a semi-automatic, 9mm caliber, Walther brand pistol. During the conversation, ADAMS refers to the firearm as "heat". Your affiant is aware from training, knowledge, and experience that "heat" is common vernacular used to reference a firearm. It is important to note that ATF identified ADAMS to have purchased a Walther, model PDP, 9mm caliber pistol, bearing serial number FDE8209, from Select Fire Weaponry on March 7, 2022, just five [5] days prior to occurrence of the above identified conversation. This firearm was subsequently recovered by MPD on November 23, 2022. Your affiant believes the firearm advertised for sale by ADAMS on March 12, 2022, to be the same as that purchased by him on March 7, 2022.

42.     Your affiant also identified a conversation between ADAMS and Facebook user "Dayme Johnson" with Facebook account ID: 100056154756163, beginning on May 6, 2023, in which ADAMS appears to discuss the straw purchasing a Glock brand firearm.

43.     Your affiant also identified a conversation between ADAMS and Facebook user "Ezo Scott" with Facebook account ID: 100009164104847, beginning on May 28, 2023, in which ADAMS sends two [2] pictures of a Glock, model 48, 9mm caliber pistol, bearing serial number BXCY058. Your affiant recognized the conversation to be consistent with the attempted sale of a

19

firearm. Approximately twenty-six [26] minutes following the transmission of the images, ADAMS and "Ezo Scott" engaged in a Facebook call which lasted a duration of approximately 28-seconds. Your affiant then conducted a trace of the serial number displayed on the Glock pistol and observed ADAMS to have purchased the firearm on April 30, 2023, from Dunham's Sports, located at 6525 S 27th St, Franklin, WI 53132. Your affiant noted ADAMS to have purchased the firearm just 28-days prior the date of the conversation with "Ezo Scott".

44.     Your affiant identified an additional conversation between ADAMS and "Ezo Scott" on June 17, 2023, in which ADAMS sends an image of an SCCY, model CPX-2, 9mm caliber pistol, with a subsequent message reading "500". ADAMS and "Ezo Scott" then engaged in a Facebook call approximately one minute later which lasted a duration of approximately 38-seconds. Your affiant recognized this conversation to be consistent with the attempted sale of a handgun for $500.00 USC.

45.     Your affiant also conducted a search of SCCY's website for the Manufacturers Suggested Retail Price (MSRP) for a model CPX-2. Your affiant observed the MSRP value to be approximately $240.00-$250.00 USC. Your affiant noted ADAMS to advertise the firearm for approximately twice the cost of the suggested retail price. Your affiant is aware that firearm traffickers, in an effort to profit from their distribution, will sell firearms well above their retail value.

46.     Your affiant is aware through investigation and observations on Facebook of TUCKER and DONELSON that they appear to be in a relationship.

**ADAMS'S CONNECTION TO 3351 N. 91ST STREET**

47.     Throughout the course of this investigation, your affiant conducted numerous surveillance operations at the believed residence of ADAMS, located at 3351 N. 91st St.,

20

Milwaukee, WI 53222 ("Premises 1"). ATF identified ADAMS as being associated to the residence based upon inquiries using law enforcement databases.

48.     On May 17, 2023, at approximately 1403 hours, your affiant observed a gray in color Ford Focus with a black decal on the sides, bearing Wisconsin (WI) registration ASW-2707 ("Target Vehicle 1") parked in the alley behind the residence in the parking slab to the south of the garage. Your affiant recognized the vehicle to be the same as ADAMS used during his attempted firearm purchase from Federal Firearms Licensee (FFL) Select Fire Weaponry on April 3, 2023. Your affiant queried the license plate through the WI Department of Transportation (DOT) and observed the vehicle to be registered to ADAMS with a listed address of 3351 N. 91st St, Milwaukee, WI 53222. Your affiant also observed the registration to be valid until June 10, 2023. It is important to note that ADAMS provided a residential address of 7451 W. Glenbrook Rd, #320, Milwaukee, WI 53223, when completing ATF Form 4473 paperwork during his purchase of a Glock, model 43 pistol from Dunham's Sports on April 3, 2023 (See previous Report of Investigation for details). Also parked in the alley on the parking slab alongside Target Vehicle 1 was a white in color Chevy Malibu bearing WI registration ARL-8640 ("Target Vehicle 2"). A check of the vehicle's registration revealed the owner to be Daniel Lee JACKSON.

49.     On May 22, 2023, at approximately 1434 hours, your affiant observed the Target Vehicle 1 parked in the alley behind Premises 1 in the parking slab alongside Target Vehicle 2. At approximately 1520 hours, your affiant then established a surveillance position outside of the Target Residence. Your affiant observed ADAMS exit the side entry located along the South-side of the residence and walk to the front porch of the residence and sit down. At approximately 1524 hours, ADAMS then re-entered the residence via the South-side entry door.

50.     On May 25, 2023, at approximately 1510 hours, your affiant observed ADAMS standing in the alleyway directly behind Premises 1. At approximately 1523 hours, ADAMS then walked towards Target Vehicle 1 and disappeared from view. Seconds later, Target Vehicle 1 was observed departing the residence and out of view of your affiant. At approximately 1540 hours, your affiant relocated to a position providing a vantage point of the front of the residence. Upon doing so, your affiant observed Target Vehicle 1 parked directly in front of Premises 1. Your affiant then observed ADAMS exit the driver's seat of the vehicle and begin walking towards the front of the residence before disappearing from view. Shortly thereafter, ADAMS was observed returning to the vehicle from Premises 1 and entering Target Vehicle 1.

51.     Later that same day, at approximately 2105 hours, your affiant observed Target Vehicle 1 traveling on W. Concordia Ave. Your affiant then observed a black, male, adult, whom he recognized the be ADAMS, exit the driver's seat of Target Vehicle 1 and enter a gas station. At approximately 2115 hours, your affiant observed ADAMS exit the gas station and return to Target Vehicle 1. The Target Vehicle then departed the Speedway and traveled directly back to Premises 1 and parked in the alley to the rear of the residence in the parking slab located south of the garage.

52.     Continuing in August 2023, your affiant applied for and obtained a cell-site location warrant for ADAMS cellular telephone assigned call number (414) 737-6433 and whose service provider is AT&T Mobility. This warrant was subsequently served to AT&T on August 14, 2023. While reviewing the data, your affiant observed ADAMS' telephone to consistently "ping" around Premises 1.

53.     On August 29, 2023, at approximately 1300 hours, your affiant observed the Target Vehicle 1 parked alongside Target Vehicle 2 in the parking slab located in the alley behind the target residence. Agents have observed that Target Vehicle 2 has consistently been parked at

22

Premises 1. At approximately 1342 hours, your affiant received an alert from AT&T that ADAMS cell phone was "pinging" in the area of Premises 1. At approximately this same time, your affiant observed ADAMS exit the residence via the south-side entry. ADAMS then walked to the rear/backyard of the residence and sat down. At approximately 1352 hours, ADAMS then re-entered the residence via the same entry.

54.     Continuing in September 2023, your affiant applied for and obtained an additional cell site location warrant for ADAMS cellular telephone (414) 737-6433 and served it to AT&T on or about September 21, 2023. Your affiant reviewed the data and observed ADAMS' telephone continue to "ping" around Premises 1.

**DONELSON'S AND TUCKER'S CONNECTION TO 4438 N. 44TH STREET**

55.     Utilizing law enforcement databases, your affiant identified the 4438 N 44th Street, Milwaukee, WI ("Premises 2") as a common address associated to both DONELSON and TUCKER. Furthermore, your affiant conducted a utilities check of the Premises 2 through the North Central High Intensity Drug Trafficking (HIDTA) Watch Center, and observed DONELSON to list on Premises 2's utilities with an activation date of June 1, 2020. Your affiant also observed the last four digits of DONELSON's social security number of "1011" to be listed in association with the utilities, as well as her telephone number (414) 295-3092. Below is a summary of the observations made by your affiant during surveillance operations of Premises 2.

56.     On June 13, 2023, at approximately 2150 hours, your affiant observed a silver in color Chevrolet Malibu with Wisconsin (WI) registration plate AMB-4584 seated against the vehicles rear windshield ("Target Vehicle 3"), parked directly across the street from the Premises 2 on the west side of N. 44th St. facing Southbound. Your affiant conducted a check of the registration through the WI Department of Transportation (DOT) and observed the registered

23

owner of the vehicle to be DONELSON. Your affiant observed this vehicle to be the same as the one utilized by DONELSON during her arrival at Federal Firearms Licensee (FFL) Select Fire Weaponry during ADAMS attempted purchase of a Glock pistol on April 3, 2023.

57.    On June 14, 2023, at approximately 0643 hours, your affiant then returned to Premises 2 and observed Target Vehicle 3 to be parked in the same location it was parked in the previous night. At approximately 0825 hours, your affiant observed Target Vehicle 3 beginning to travel Southbound on N. 44th St. Your affiant was unable to observed who had entered the vehicle. Your affiant then surveilled the Target Vehicle 3 as it turned Eastbound on W. Congress St. and then Southbound on N. Sherman Blvd. Your affiant then observed the vehicle travel to 4222 W. Capitol Dr., Milwaukee, WI 53216, where it arrived at approximately 0830 hours, and park in the rear lot located on the North side of the building.

58.    On June 15, 2023, at approximately 0717 hours, your affiant returned to Premises 2 and observed Target Vehicle 3 parked directly in front of the residence on N. 44th St. facing Northbound. At approximately 0830 hours, your affiant observed movement coming from the front porch area of the Premises 2 that he believed to be someone exiting the front door. Moments later, your affiant observed DONELSON, approach Target Vehicle 3 from the direction of Premises 2 and access the driver's door of the vehicle with a key. Your affiant then observed DONELSON enter the vehicles driver's seat and observed the front head lights to activate.

59.    On August 30, 2023, at approximately 1528 hours, your affiant observed a black female who he recognized as DONELSON, and an unknown black female, exit the front door of the Premises 2 and being walking Southbound on N. 44th St. before turning Eastbound on W. Congress St. and disappearing from view.

24

60.     On September 22, 2023, 1802 hours, Target Vehicle-1 was observed travelling northbound on N. 44th St. and parking immediately north of Premises-2. ADAMS was then observed exiting the driver's seat and approaching Premises-2, along with DONELSON and an unknown female. The three subjects were then observed conversing on the front porch area of the residence and smoking what appeared to be a marijuana blunt. At approximately 1822 hours, a black male adult, wearing a red shirt, believed to be TUCKER, exited the front door of the residence and then sat down on a chair located on the front porch. ADAMS eventually returned to Target Vehicle-1 and entered the driver's seat. Shortly thereafter, DONELSON and TUCKER approached Target Vehicle-2 and DONELSON was observed entering the vehicle's driver's seat as TUCKER entered the front passenger seat. Target Vehicle-1 containing ADAMS then departed the location travelling northbound on N. 44th St. as DONELSON and TUCKER followed behind in Target Vehicle-2.

61.     On September 26, 2023, your affiant observed TUCKER enter and exit the front door of Premises 2 throughout the course of the surveillance. Your affiant positively identified TUCKER based upon a comparison of his Wisconsin Department of Transportation issued driver's license image. SA Mulvey also observed TUCKER access Target Vehicle 3 numerous times throughout the course of this investigation.

62.     On September 26, 2023, your affiant observed DONELSON and TUCKER enter and exit Premises 2 multiple times throughout the course of the surveillance.

**CONCLUSION**

63.     To date, ATF has identified twenty-two [22] firearms purchased by ADAMS in which twelve [12] have been recovered by law enforcement in relation to a criminal investigation. Your affiant believes based on his training, knowledge, and experience that the frequency in which

25

the firearms purchased by ADAMS have been recovered following a crime are indicative of firearms trafficking/straw purchasing.

64. As part of this investigation, your affiant obtained and reviewed purchase documents completed by ADAMS during many of the above identified firearms purchases to include ATF Form's 4473 and WI DOJ Firearms Dealer Notification (Handgun Transfers) forms. While reviewing the ATF Form's 4473, your affiant observed ADAMS to mark "Yes" when answering question 11. a. located in Section A/21. a. located in Section B on each form, which asks, "Are you the actual transferee/buyer of the firearm(s) listed on this form?" The question also warns the purchaser in bold lettering that they are not the actual transferee/buyer if they are acquiring the firearm(s) on behalf of another person. Notably, your affiant observed ADAMS to have initially answered "No" when answering this question during his May 26, 2016, purchase of the two [2] above detailed Smith & Wesson pistols from FFL Mills Fleet Farm. ADAMS then revised his response by drawing a line through his answer, and then marking "Yes", claiming to be the true purchaser. Your affiant also observed ADAMS to mark "No" on each form when answering all additional questions regarding whether the various prohibiting factors of firearm possession apply to him. It should also be noted that the ATF Form 4473 has undergone numerous revisions between ADAMS initial firearm purchase and his most recent purchase on April 3, 2023; and that question 21. a. located in Section B on the current form was previously identified as question 11. a. of Section A on previous forms.

65. Your affiant also observed ADAMS to have signed each form, certifying that the information provided was true, correct, and complete. Also, by signing, ADAMS declared that he read and understood the Notices, Instructions, and Definitions on the ATF Form 4473, and that by falsely answering "yes" to Section A, question 11. a./Section B, question 21. a., claiming to be the

26

true/actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. Furthermore, ADAMS understood that making any false oral or written statement or exhibiting any false or misrepresented identification with respect to the transactions, is a crime punishable as a felony under Federal law and may also violate state and/or local law. Lastly, ADAMS understood that "the repetitive purchase of firearms for the purpose of resale and profit without a federal firearms license is a violation under Federal law."

66.     Accordingly, based upon the information contained in this affidavit and based on my training and experience, I believe there is probable cause to believe that Premises 1, Premises 2, Target Vehicle 1, Target Vehicle 2, and Target Vehicle 3, contain evidence, fruits, and instrumentalities of violations of Possession of a Firearm by a Convicted Felon, in violation of Title 18, United States Code, Section 922(g)(1); Engaging in the Business Without a Federal Firearms License, in violation of Title 18, United States Code, Section 922(a)(1)(A); and False Statement During the Purchase of a Firearm, in violation of Title 18, United States Code, Section 922(a)(6) & 924(a)(1)(A), as further described in Attachment B. Furthermore, based upon your affiant's training and experience, your affiant seeks permission to search all persons on the premises/located inside vehicles connected therewith, because the premises in question is a private residence and firearms and other firearm-related contraband may easily be secreted on one's person; furthermore, that the execution of a firearm and/or narcotics search warrant often reveals the presence of persons other than the residents on the premises and that such persons include, but are not limited to, persons helping with the sale of firearms, potential firearm buyers, and that it is common to find firearms on these persons; as well as the items listed in Attachment B.

27

## TECHNICAL TERMS

67.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   c.   Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

68.     As described above and in Attachment B, this application seeks permission to search for records that might be found on Premises 1 and Premises 2 (collectively, the "Premises") or Target Vehicle 1, Target Vehicle 2, or Target Vehicle 3 (collectively, the "Target Vehicles"),

28

in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

69.    *Probable cause.*  I submit that if a computer or storage medium is found on the Premises or Target Vehicles, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few

29

examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

70.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises or Target Vehicles because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

30

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally,

31

some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely

32

reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

71.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be

33

unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

72. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the

34

entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

73.     Because several people share the Premises and Target Vehicles, it is possible that the Premises or Target Vehicles will contain physical evidence, including storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**Premises to be Searched**

1.      **3351 N. 91st St. Milwaukee, WI, and Detached Garage (Premises 1):** The residence is described as a two-story residence with beige siding, white trim, and has a shingled roof, with a detached garage. The front of the residence faces east and has two concrete steps leading to the front door which is secured by a white in color security door. The numbers "3351" are affixed along the right/north-side of the front entry. The property also has a cement walkway which leads to the front of the residence as well as wraps around to the south perimeter, leading to the side entry and rear of the residence. Located to the rear of the residence is a detached garage facing west with white siding and a shingled roof, which is attached to the alley and neighbored by a parking slab to the south. Below is a photograph of the front of the residence. This Search Warrant is to include areas within the Premises where firearms and other contraband can be secreted, including but not limited to storage lockers, detached closets, silos, outbuildings, detached garages, containers, vehicles and curtilage and yard areas connected to the Premises.



36

**Vehicles to be Searched**

2.    **TARGET VEHICLE 1:** A silver in color Ford Focus bearing Wisconsin registration plate ASW-2707. Below is a photograph(s) of Target Vehicle 1, if located in the Eastern District of Wisconsin.



3.    **TARGET VEHICLE 2:** A white in color Chevy Malibu bearing WI registration ARL-8640. Below is a photograph of Target Vehicle 2, if located in the Eastern District of Wisconsin.



37

# ATTACHMENT B

## Particular Things to be Seized

All physical items, records, and information on the Premises and within the Target Vehicles described in Attachment A, or on any cellphones, computers, electronic devices, and media storage devices containing evidence of or used as a means to commit violations of Title 18, United States Code, Section 922(g)(1); Engaging in the Business Without a Federal Firearms License, in violation of Title 18, United States Code, Section 922(a)(1)(A); and False Statement During the Purchase of a Firearm, in violation of Title 18, United States Code, Section 922(a)(6) & 924(a)(1)(A), including but not limited to the following, occurring after September 30, 2018:

    a.    ATF Form 4473s, firearms, firearm boxes, bipods, tripods, upper receivers, receipts and any records related to firearms, firearms accessories, and ammunition.

    b.    Any and all financial records, including bank records, checks, credit card bills, account information, connected to the purchase, sale, or distribution of firearms, and any correspondence between suspects, conspirators, and other firearms sellers and/or purchasers;

    c.    Lists of contacts and any identifying information;

    d.    Lists of customers and related identifying information;

    e.    Photographs, videos, or other media storage connected to firearms;

    f.    Types, amounts, and prices of firearms purchased/sold;

    g.    Any information related to sources or purchasers of firearms (including names, addresses, phone numbers, or any other identifying information);

    h.    Any information recording a suspect or conspirator's schedule or travel from September 30, 2018 to the present;

38

i.  All bank records, checks, credit card bills, account information, and other financial records related to firearms commerce;

j.  Any and all financial records connected to the purchase/sale of firearms;

k.  Proceeds of firearms trafficking activities, including United States currency;

l.  Personal address books, telephone bills, photographs, letters, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in firearms trafficking activities;

m.  Documents and deeds reflecting the purchase or lease of items obtained with the proceeds from firearm trafficking activities;

n.  Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

o.  Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data;

p.  Indicia of occupancy, residency or ownership of the premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys;

q.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

39

r.  Records and information relating to a conspiracy traffic firearms;

s.  Records and information relating to the e-mail and Facebook accounts names in the affidavit;

t.  Records and information relating to the identity or location of the suspects;

u.  Records and information relating to the crimes referenced in paragraph 1 above.

2.  Evidence obtained from the forensic examination of all cellphones, computers, electronic devices, and media storage devices containing evidence of or used as a means to commit the violations described above.

3.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"[1]):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

---

[1] The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, cellphones, mobile phones, tablets, server computers, and network hardware.

40

c. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. records of or information about Internet Protocol addresses used by the COMPUTER;

j. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

41

videotapes, motion pictures, or photocopies).

The term "storage medium" includes any physical object upon which computer or cellphone data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of ADAMS; (2) hold a device found to belong to ADAMS in front of ADAMS's face, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

42